Filed 5/21/26  J.P. v. Super.Ct. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| J.P.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>        Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY et al.,<br><br>        Real Parties in Interest. | A175860<br><br>(San Mateo County<br>Super. Ct. Nos. 24-JD-0105,<br>24-JD-0106, 24-JD-0107) |

J.P. (father) seeks extraordinary writ relief from a March 10, 2026 order terminating reunification services to father for H.P., N.P., and Z.P. (the children)[1] and setting a hearing to consider termination of parental rights under Welfare and Institutions Code section 366.26 (section 366.26 hearing; statutory references are to this code).

We deny the petition as substantial evidence supports the juvenile court's finding that the San Mateo County Human Services Agency (the Agency) provided reasonable services to father.  We deny as moot the related

---

[1] The children's mother was bypassed for reunification services.  Only father is a party to this writ proceeding.

1

request for a temporary stay of the section 366.26 hearing set for June 25, 2026.

**FACTUAL AND PROCEDURAL BACKGROUND**

We set forth only those facts necessary to resolve this writ proceeding. As mother is not a party to this proceeding, we focus almost exclusively on father's circumstances.

The following summary is based in part on our prior opinion in *In re Z.P.* (Apr. 1, 2026, A173553) [nonpub. opn.] (*Z.P.*) as to the events at issue in that decision, specifically those leading up to and including the combined six- and 12-month review hearing.

*Circumstances Leading to Dependency Petitions*

Unless and until otherwise indicated, dates refer to 2024.

"In March, the Agency filed a juvenile dependency petition as to H.P., then two months old (born December 19, 2023), pursuant to section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), and (e) (serious physical abuse to a child under five). The Agency also filed petitions as to N.P. (H.P.'s twin), then two months old (born December 19, 2023), and Z.P., then six years old (born April 1, 2017), pursuant to section 300, subdivision (j) (abuse of a sibling). Subsequent petitions containing virtually the same allegations were filed, culminating in the operative second amended petition.

"The petitions alleged the following. Father brought H.P. to the hospital on February 27 as H.P. was nonresponsive, lethargic, and would not open his eyes. Father was observed to be under the influence of marijuana. H.P.'s pupils were unequal in size and his body temperature was 91.2 degrees. A CT scan showed H.P. had a bilateral subdural hematoma, suspected swelling of the optic discs, and a retinal hemorrhage. He was

2

categorized as near fatal and transferred to another hospital. Father denied knowledge of, and could not otherwise explain, the cause of H.P.'s injuries.

"On February 28, mother reported that, about five hours before father brought H.P. into the hospital, H.P. had fallen off an air mattress and, though he had no marks or bruises on his head, mother noticed he would not open his eyes. Mother later reported that, on February 26, she threw H.P. onto her bed, causing him to bounce and fling his head. On February 27, the day H.P. went to the hospital, mother had shaken him four times and tossed him into his car seat where he slammed his head, and he appeared to have a seizure.

"Medical staff opined H.P.'s injuries were due to abusive head trauma and were not typical of a short fall with no external signs of impact. The Agency concluded H.P. suffered serious physical harm inflicted, not by accident, by a parent." (*Z.P.*, *supra*, A173553.)

*Detention Reports and Hearing*

"The Agency filed a detention report seeking to detain the children from both parents given the severity of the injuries to H.P., deemed to be highly suspicious for physical abuse. The report stated father did not take H.P. to the hospital until several hours after he first noticed H.P. was unresponsive, despite mother urging him to do so. Father reported that he did not call 911 or take H.P. to the hospital immediately because he wanted the parents to 'get him to open his eyes on their own.' Father also reported smoking marijuana about two hours before taking H.P. to the hospital 'to calm his nerves.' An addendum to the report indicated father did not know mother had hurt H.P.

"At the March 4 detention hearing, father was present and was appointed counsel. The juvenile court ordered the children detained from

3

both parents pending disposition but ordered supervised visits for father with all three children." (*Z.P.*, *supra*, A173553.)

*Jurisdiction/Disposition Reports and Hearings*

"The April jurisdiction/disposition report stated H.P. was discharged from the hospital on March 14 and placed at a shelter care home certified to care for medically fragile infants, and N.P. was placed in the same home. Z.P. was placed in a separate foster home.

"The April report provided the following summary of H.P.'s injuries. H.P. suffered at least two separate instances of abusive head trauma as he had bleeding in his brain that was both fresh and several weeks old. He also had numerous injuries that were indicative of head trauma and being shaken, including to the ligaments behind his neck, compression fractures to his lower lumbar vertebrae, bleeding in his spine, and fractures in both femurs. He required a feeding tube for food and medication. A doctor opined that H.P. will likely have disabilities to his motor development, cognition, and speech.

"The April report noted that father appeared to be under the influence of marijuana when he brought H.P. to the hospital and admitted to smoking marijuana earlier that evening." (*Z.P.*, *supra*, A173553.)

Several addenda to the jurisdiction/disposition report were filed in the following five months. As relevant for our purposes, the May addendum contained a case plan for father with numerous objectives, such as attending the children's medical and specialty care appointments, participating in parent education services, including for children with disabilities, and completing a mental health assessment and participating in its recommended services. (*Z.P.*, *supra*, A173553.) The addenda indicated father was taking advantage of services being offered by the Agency, including transit cards

4

and "Medi-Cal Lyfts" for transportation to visits with the children, a parenting assessment, SafeCare parenting services, and meeting with a therapist weekly. (*Z.P., supra*, A173553.)

"The addenda also noted H.P. had numerous neurological and developmental complications requiring extensive medical and specialty appointments. For example, H.P. had poor vision requiring specialty glasses and use of eyepatches; was at high risk for having cerebral palsy; had an increased risk of developmental delay, development of epilepsy, and learning difficulties; had gastronomy tube surgery in September; and would likely continue to require tube feeding for at least the near future. H.P. was moved to a different home certified for medically fragile infants in July. N.P. and Z.P. were placed with the paternal grandparents in August and October, respectively.

"The court held contested jurisdiction hearings in August and September. After hearing evidence, the court sustained the operative dependency petitions as to each of the children and made true findings on the allegations in the petitions. Among the relevant findings, the court found father should have known from the severity of H.P.'s injuries, his nonresponsive state, and his seizures that H.P. was being abused by mother and needed emergency care. The court further found father delayed in taking H.P. to the hospital for many hours and that hospital employees indicated father appeared to be under the influence of marijuana." (*Z.P., supra*, A173553.)

*Disposition Updates and Hearings*

Contested disposition hearings took place on 11 dates between October 23, 2024, and April 21, 2025. The following relevant updates took place over that period of time.

5

Father continued to participate in weekly therapy sessions and completed the SafeCare parenting classes in March 2025.

Although father attended a majority of H.P.'s medical appointments and twice weekly physical, occupational, and feeding therapy appointments through the end of 2024, father began struggling to consistently attend the appointments once he could no longer use Medi-Cal Lyfts (as the children were not in his care so it was not an approved use), and by March 2025 he was attending the specialty appointments virtually rather than in person.

During this time, "[t]he social worker continued to engage with father, including reminding him of upcoming appointments, providing monthly public transit cards for transportation costs (both before and after there were issues with the Medi-Cal Lyfts), mapping out transit routes before appointments, and requesting alternative transportation methods on an appointment-by-appointment basis. The social worker encouraged father to attend H.P.'s occupational and physical therapy sessions in person to engage in the activities with him, but father stated he was unable to do so due to lack of transportation." (*Z.P.*, *supra*, A173553.)

"In January 2025, the case plan was updated to include as an objective that father '[s]tay free from illegal drugs and show [his] ability to live free from drug dependency,' comply with required drug tests, and 'soberly parent the children.'" (*Z.P.*, *supra*, A173553.)

In March 2025, H.P.'s counsel requested the court order reunification services for father, to include an Alcohol and Other Drug (AOD) assessment and follow recommended treatment, which was not previously included in father's case plan, as well as classes tailored to special-needs parenting given H.P.'s needs, which the reports indicated father had been minimizing. H.P.'s counsel argued father's marijuana use on the night H.P. was brought to the

6

hospital resulted in significant delay and in father being under the influence at the hospital.

Father completed an AOD assessment in March. The April 15, 2025 assessment report indicated father met the criteria for "Cannabis Use Disorder, Moderate." It was recommended that father participate in an outpatient substance abuse treatment program and provide regular urinalysis testing to confirm a decrease in use. The assessor opined father was under the influence during the interview and a drug test at the time of assessment was positive for "a very high level of THC metabolites."

In April 2025, a public health nurse assigned to the case spoke to father about additional parent education resources for parents with children with special needs and set up calls for father with various specialists relevant to H.P.'s needs. Father enrolled in a new parenting class for children with special needs through "Support for Families" beginning on April 15, 2025.

"At the conclusion of the disposition hearings, on April 21, 2025, the court found removal of the children from father's custody was necessary for their protection and declared the children dependents of the court. It ordered family reunification services to father. The court noted H.P.'s counsel had requested the AOD assessment and special-needs parenting classes and the court ordered those services as it found them to be appropriate. [¶] The court bypassed reunification services for mother." (*Z.P.*, *supra*, A173553.)

*Combined Six- and 12-month Hearing*

Unless otherwise noted, all further dates refer to 2025.

Due to statutory time constraints, a combined six- and 12-month hearing (combined hearing) was held just days after the final disposition hearing, on April 25.

7

"In the status review report filed ahead of the [combined hearing], the Agency stated father had received over 13 months of pre-disposition reunification services and had engaged with the Agency and service providers. However, the Agency was concerned that father was completing services without gaining insight from them. The Agency also had concerns that father was minimizing the severity of H.P.'s injuries and how those injuries continued to put H.P. at risk for developing issues with 'muscle tone, bilateral weakness and/or spasticity, cerebral palsy, developmental delays, epilepsy, learning difficulties, limited mobility, and vision impairments.' The Agency recommended continuing services to father until the 18-month meeting." (*Z.P.*, *supra*, A173553.)

That status review report also noted that, up to that point, father had attended 88 of 115 visits with the children, all of which had been supervised by the Agency. The visits had mostly been good and there were no obvious safety concerns as to N.P. and Z.P., and the Agency therefore wanted to exercise its discretion to delegate supervision of visits with N.P. and Z.P. to the paternal grandparents, with whom they were living. However, the Agency planned to continue to supervise father's visits with H.P.

Father did not argue for return of the children at the April 25 hearing, but he questioned the reasonableness of the reunification services offered as two referrals (the AOD assessment and special-needs parenting classes) had only just been made. Father argued that, as the circumstances leading to jurisdiction included allegations that he used marijuana, the AOD assessment could have been made earlier and he could have been done with treatment by that point.

At the conclusion of the combined hearing, the court found return of the children to father would create a substantial risk of detriment to their safety

8

and that the Agency had provided reasonable services to father up to that point. However, as it found there was a substantial probability the children could be returned to father's care by the 18-month review hearing, it ordered continued reunification services to him.

The court also ordered continued supervised visits for father, and granted the Agency discretion to delegate supervision and to move visits to monitored or unsupervised.

*Z.P.: Appeal from April 25 Order*

Father appealed the court's reasonable services finding from the April 25 hearing. On April 1, 2026, we concluded the court erred by finding, at the time of the combined hearing, reasonable services had been offered to father as the AOD referral and assistance in enrolling in a special-needs parenting class had been offered to him only weeks before the combined hearing. (*Z.P.*, *supra*, A173553.) Notably, however, we recognized the Agency had provided an array of other resources to father, and we "commend[ed] the Agency's efforts to maintain communication with father throughout the case and help him attend the children's many appointments and visitations." (*Ibid.*)

In addition, we "stress[ed] that our finding [was] limited only to the court's finding of reasonable services at the time of the April 25, 2025 combined hearing, and we express[ed] no opinion as to any subsequent findings regarding whether reasonable services have been provided to father *after* the combined hearing, such as between the combined hearing and the 18-month hearing." (*Z.P.*, *supra*, A173553.)

*18-month Hearing Updates*

Between the combined hearing on April 25 and the final 18-month review hearing on March 10, 2026, the Agency maintained consistent contact with father and provided various services, including transit cards, reminders

9

for appointments, therapy, and free car transportation through Medi-Cal. Of particular relevance to this writ proceeding are two aspects of the services offered to father during this time period: father's substance abuse testing and treatment and his visitation with the children.

*Substance Abuse Testing and Treatment*

Father tested positive for THC on every single drug test he took throughout the entire course of the proceedings, from April 2025 through February 2026. He was on a set testing schedule (every Tuesday and Wednesday, days which he requested) rather than being randomly tested.

Father began attending outpatient substance abuse services at Sitike Counseling Center (Sitike) in June. He completed his intake on June 24 and began group sessions on July 1. He completed at least 13 group sessions and 12 individual sessions at Sitike through November, when the outpatient program ended.

Father's outpatient counselor at Sitike stated father completed his individual and group sessions but did not " 'successfully' " complete the program because he continued to test positive. She explained he was "still in the 'precontemplation phase,' " the first phase of the program model, in which "individuals do not recognize their behavior as a problem, lack awareness of the problem, and are resistant to change."

The counselor opined the outpatient program was not appropriate for father at that time and had informed father that he needed a higher level of care. Specifically, he needed to at a minimum engage in an intensive outpatient program (IOP); she provided father resources for the HealthRight 360 IOP, but he declined and stated he could not go in person. She talked with father many times about his drug use and recommended he stop all use of THC, but he refused to do so and did not recognize the need for treatment.

He told her at the end of the program that he "quit" using marijuana, but he still used THC in liquid form to help with pain management and would not stop using it. The counselor did not recommend any other services as father was unwilling to engage in a higher level of care.

In January 2026, the social worker reminded father that Sitike recommended an IOP due to his lack of behavioral change in the Sitike outpatient program. Father told the social worker he was planning to call HealthRight 360 (the IOP provider) the following day, but he also stated he was unwilling to attend an in-person IOP and would only enroll in an online program. When the social worker explained it was important for him to follow Sitike's recommendation, he stated he did not need an IOP and " 'no one is saying that. I don't do drugs. I am not addicted.' "

In February 2026, father reported he was not engaged in any substance abuse treatment program. He reported attending multiple Alcoholics Anonymous meetings weekly.

*Visitation*

In June, the Agency indicated father continued to have positive, supervised visits with the children twice a week, which the Agency coordinated in collaboration with the children's grandparents. Some visits took place at various Agency locations and others took place at a public library, chosen for its central location.

On June 10, the social worker sent an e-mail to counsel notifying them of her intent to liberalize the visits with father for all three children from supervised to monitored. Counsel for N.P. and Z.P. agreed to liberalize visits with those children from supervised to monitored, but H.P.'s counsel did not agree "due to concerns about the father's drug test results while in treatment

11

and the father leaving early from visitations with [H.P.]" The Agency therefore decided not to change the visits with H.P.

Beginning in July 2025 and continuing into February 2026, father continued to have supervised visits with the children but also had visits with Z.P. and N.P monitored by the paternal grandmother without Agency supervision, usually at a nearby park or at the grandmother's home.

At a November 4 hearing, the court expressed to the Agency (off-record) that it wanted the Agency to progress father's visits with N.P. and Z.P. The court and the parties discussed having the Agency inspect father's three-bedroom house in San Francisco for safety, which is where father wished to have the children live with him if they were returned to him.

Following that hearing, the Agency stated it was working with father to progress his visits with N.P. and Z.P. from monitored to unsupervised and to change the location of the visits to the father's home in San Francisco if appropriate. In connection with that effort, the Agency asked father who lived in that home; he replied he stayed with mother in San Bruno but planned to stay at the San Francisco home when he had the children. He said his brother and cousin stayed in the San Francisco home but refused to provide their information to the social worker even after being reminded she was trying to support the progression of visitation and reunification.

Later in November, the social worker scheduled an in-home visit at the San Francisco home and confirmed the visit with father beforehand. During the in-home visit, the social worker reported the following. She smelled marijuana smoke upon first entering, but the odor dissipated within a few minutes and was replaced by a strong cleaning product smell. There was ash and a burn hole on the arm of the couch along with a strange item, which father stated was a torch for lighting incense. The living room was small and

clean (with some small clutter) and the first floor of the home had clean, new wood flooring, but the stairs had strips with nails sticking up running along the sides of the steps. The kitchen was clean and appeared safe, but there was a large pile of trash and household items on the other side of a glass door.

When the social worker went upstairs, she heard a voice and asked father if someone was there, but he said no. The social worker saw a man kneeling at a toilet and dumping a small garbage can into the toilet. The man said he was father's cousin and had come over the night before to spend the night and got sick. The cousin went into a room that looked "well lived in," set up with a bed and personal items. Father stated it was an extra room.

Father's bedroom was reasonably clean and looked appropriately set up for an adult. He stated that was the room that he and the children would share if they slept there. A third bedroom, which father said was also an extra room, was very messy and unsafe, containing a stained mattress with items above and below it. There were items scattered around the room and big garbage bags full of unknown items. On a shelf in the closet was a large clear plastic container with a spout containing a bright green liquid, which father stated was " 'old Kool-Aid' " without clearly explaining why it was there.

When the social worker expressed concern about the condition of the home and noted father had many days to prepare for the visit, father stated he had been cleaning up the house and would clean everything before the children came. He also planned to fix the issue with the exposed nails, dispose of all the trash, and bring children's items over if the visits were to take place there, which is what he wanted. Father denied that anyone else,

including his brother or cousin, lived at the house. As of December 9, father reported he was still working on the house.

In November, mother and father had another child, S.P., who was detained from the parents but is not involved in the instant writ proceeding.

In February 2026, the social worker attempted to again visit the San Francisco home to see if it was appropriate and offered father two dates that worked for her and the social worker on S.P.'s case, who wanted to see the home as well. Father stated he was not available but offered another date. However, the social workers were not available that day; no additional dates appear to have been discussed and the visit did not take place.

Throughout this period, father regularly attended visits with the children, but he also canceled or left early from some visits, including some monitored visits with N.P. and Z.P. Visits with N.P. and Z.P. did not progress from monitored to unsupervised visits.

*18-month Review Hearings*

In its final report in February 2026, the Agency stated father remained engaged with service providers, but it was concerned he was completing services without fully understanding their purpose or gaining insight into the underlying issues affecting the health and safety of his children. "[F]ather minimizes the impact that his substance use has on the family, even though his substance use was included in the petition, and he refuses to take responsibility for his lack of progress and behavioral change. The father continues to assert that he will figure it all out once the children are returned to his care, instead of demonstrating an understanding of the issues and show ability to actively care for and protect the children now."

The 18-month review hearings took place on several dates between August 2025 and March 2026. The court heard testimony from numerous

14

witnesses and considered the reports and addenda prepared in connection with the hearings, which were consistent with the above information regarding father's engagement with substance abuse testing and treatment and visitation with the children.

The Agency recommended terminating reunification services to father, and counsel for the children joined in that recommendation. Father argued the court must return the children to his care and custody.

At the final hearing on March 10, 2026, the court discussed visitation and noted father never asked for overnight visits with N.P. and Z.P., which father's counsel explained was because the visits never progressed to unsupervised (a prerequisite step) despite repeated requests. The court questioned whether the visits did not progress because there was no evidence the San Francisco home was ready, despite counsel's representation that it was, and noted father could have brought in photos or other evidence to demonstrate it was ready.

The court also explained it was concerned with what father's plan was if the court were to return the children to his custody. Counsel replied they did not have a formal plan, but father planned to set up the home in San Francisco for the children, get "all the child equipment ready for them" at that home, and have them live there with him. The court was surprised father did not have a formal plan as he had been asking for return of the children for several months.

At the conclusion of the hearing, the court recounted the series of events leading to the dependency proceedings and noted father appeared to be under the influence of marijuana when he took H.P. to the hospital. The court stated H.P. had extreme physical disabilities and special needs (though

he was making progress in therapies), N.P. had speech issues, and Z.P. had schooling concerns.

The court detailed the state of father's San Francisco home during the in-home visit, as described above. The court had concerns about father's credibility and honesty because he told the social worker no one was at the home, yet his cousin was present and appeared to be living there.

The court found by clear and convincing evidence that reasonable services had been offered to father as the record was abundant with the efforts made to assist him, including transportation, transit cards, setting up drug testing on days that were convenient for him, and setting up various other services.

The court found this to be a difficult case because father had complied with the service plan, but the problem was whether he made enough progress to meet the objectives of the plan and safely return the children to him; otherwise, the reason for removing the children would not have been ameliorated. The case began with father delaying bringing H.P. to the hospital and being under the influence of marijuana, but two years later and throughout the two years he was still testing positive for marijuana. The court believed father was never going to give up marijuana and, because he was in the early "pre-contemplation" stage, he failed to understand the effect that had on him.

The court stated: "[W]hen he is under the influence of marijuana, he is distracted and not focused. Three children with special needs requires focus and attention, 100 percent. And when a parent is known to use marijuana regularly, to be diagnosed with this condition, with three children with special needs, and given the opportunity for over two years to address

16

this issue, he has not done so. He has not done so. In fact, he refuses to do so."

Accordingly, the court found return of the children to father would create a substantial risk of detriment to them, terminated reunification services to him, and scheduled a section 366.26 hearing for June 25, 2026.

Father filed a writ petition seeking relief from the court's order and requesting a temporary stay of the hearing.

**DISCUSSION**

Father's sole argument is that, because the visits with N.P. and Z.P. never progressed to unsupervised, the court erred in finding reasonable services were offered. A review of the record reveals that the court's finding is supported by substantial evidence.

## I. Applicable Law

When a child is removed from the custody of a parent, the court ordinarily must order child welfare services for the purpose of facilitating reunification of the family. (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*).) When at least one child in a sibling group is under three years old at the time of initial removal, as H.P and N.P. were, the parent is presumptively eligible for at least six months of reunification services. (See *id.* at p. 625 & fn. 5; § 361.5, subd. (a)(1)(B), (C).) During this stage of dependency proceedings, the court holds periodic review hearings to evaluate reunification efforts and appropriate next steps, including the adequacy of the reunification services offered or provided and the parent's progress. (*Michael G.*, at p. 625; see § 366.21.)

Because the court found at the combined hearing a substantial probability the children may be returned to father within six months, the court extended reunification services and continued the case for an additional

17

six months. (*Michael G.*, *supra*, 14 Cal.5th at p. 625; § 366.21, subds. (e)(3) & (g)(1).) This led to the 18-month review hearings at issue in this writ proceeding, which generally represents the maximum period for reunification services. (§ 361.5, subd. (a)(3)(A); *Michael G.*, at p. 633.)

At the 18-month review hearing, if the court decides the children cannot be safely returned to the parent's custody, "the court ordinarily must proceed to schedule a permanency planning hearing under section 366.26, at which the court decides whether to terminate parental rights and place the child for adoption or else select another permanent plan." (*Michael G.*, *supra*, 14 Cal.5th at p. 627; § 366.22, subd. (a)(3).)

Additionally, "[t]hough a court at the 18-month review hearing must determine whether reasonable services have been offered or provided to the parent, an affirmative answer is not a statutory prerequisite to setting the permanency planning hearing." (*Michael G.*, *supra*, 14 Cal.5th at pp. 629– 630.) Hence, a court may set a section 366.26 hearing even if it finds a parent did not receive reasonable reunification services in the immediately preceding 12- to 18-month review period. (*Id.* at p. 634.)

However, importantly for this case, a court is prohibited from terminating parental rights at the permanency planning hearing if the Agency " 'has failed to offer or provide reasonable reunification services to a parent *throughout* the reunification period.' " (*Michael G.*, *supra*, 14 Cal.5th at p. 629.)

As to the adequacy of reunification services, the Agency must make a good faith effort to develop and implement a reunification plan, and we judge the adequacy of that plan and the reasonableness of the Agency's efforts based on the circumstances of each case. (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.) " '[T]he record should show that the

supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*Ibid.*) The standard is whether the services provided were reasonable under the circumstances, not whether they were the best that might have been provided. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

A critical component of reunification services is visitation as, without visitation, reunification is close to impossible. (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 673 (*Serena M.*).) To that end, visitation "shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) " 'While visitation is a key element of reunification, the court must focus on the best interests of the children "and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm . . . ." ' " (*Serena M.*, at p. 673.)

We review a court's reasonable services finding for substantial evidence. (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1150, 1155.) "In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the [juvenile] court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

**II. Substantial Evidence Supports the Court's Reasonable Services Finding Despite the Failure To Liberalize Visits with N.P. and Z.P.**

As noted above, we concluded in *Z.P.* that the court's finding of reasonable services up to the point of the combined hearing was erroneous. (*Z.P.*, *supra*, A173553.)  Hence, though the court could set the section 366.26 hearing regardless of its reasonable services finding at the 18-month hearing, it may terminate father's parental rights only if it properly found reasonable services were offered at *some* point in the proceedings, including in the 12- to 18-month review period at issue here.  (See *Michael G.*, *supra*, 14 Cal.5th at pp. 629–630.)  For the reasons we explain, substantial evidence supports the court's finding of reasonable services.

In finding reasonable services had been offered to father, the court pointed to the "abundant" efforts in the record by which the Agency sought to assist father throughout the proceedings, such as transportation, transit cards, and setting up drug testing on days of his choosing, among other services.  Indeed, the record is replete with actions by the Agency over the course of nearly two years to offer services to father, including SafeCare parenting classes, individual therapy, Medi-Cal car service when available, transit cards for public transportation, mapping out transit routes, regular reminders for appointments and visits, setting up visitation with the children at various Agency locations throughout the Bay Area, setting up monitored visits with N.P. and Z.P. with the paternal grandmother, several months of substance abuse testing and treatment, and trying to help father enroll in an IOP after it was recommended by Sitike.  Plainly, there is substantial evidence in support of the court's finding.

Further, although we found the reasonable services finding at the time of the April 25, 2025 hearing was erroneous in *Z.P.*, that conclusion was

20

premised solely on the recency of two critical referrals (for the AOD assessment and special-needs parenting classes), which were made just weeks before the combined hearing. (*Z.P.*, *supra*, A173553.) We still recognized the numerous other resources provided to father, including the ones described above, and commended the Agency's consistent communication with father and assistance in helping him attend the visits and appointments. (*Ibid.*) Nearly a year passed between that hearing and the finding of reasonable services in March 2026, during which time numerous services—including substance abuse treatment and testing—were steadily provided or offered to father.

Father nevertheless avers the failure to liberalize his visits with N.P. and Z.P. to unsupervised precludes a finding of reasonable services. In support, he relies on *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*), in which the appellate court found visitation services were unreasonable where the agency failed to advance the parents' visits with their asthmatic child. In that case, the agency refused to progress the visits to unsupervised based solely on feeling " 'uncomfortable' " leaving the child alone with the parents, who had developmental disabilities, despite evidence that their disabilities did not endanger the child. (*Id.* at pp. 1419, 1426.) Notably, in *Tracy J.*, supervised visits at the parents' home involved a clean home without any safety concerns. (*Id.* at p. 1421.)

In that context, the *Tracy J.* court held an agency may not "impede the progression of visitation services to a parent solely out of concerns about the parent's mental health status." (*Tracy J.*, *supra*, 202 Cal.App.4th at p. 1419.) The court explained: "When the Agency limits visitation in the absence of evidence showing the parents' behavior has jeopardized or will jeopardize the child's safety, it unreasonably forecloses family reunification on the basis of

21

the parents' labeled diagnoses, and does not constitute reasonable services." (*Id.* at p. 1427.)

Father's case is readily distinguishable from *Tracy J.* Fundamentally, there is no evidence that the progression of visitation was limited due to vague feelings of being "uncomfortable" despite no evidence of danger to the child. And, of course, here the Agency did not withhold visitation due to concerns about a developmental disability as to father.

Further, the Agency took steps to progress the visits with N.P. and Z.P. to unsupervised, which were expected to take place at father's San Francisco home, by conducting the in-home visit in November 2025. Unlike the safe home in *Tracy J.*, father's home included a torch on the couch, exposed nails on the stairs, trash throughout the home, an odor of marijuana, and an unexpected cousin who may have been living there. Though father asserted at the March 2026 hearing that the home was safe, the court found he failed to provide photos or any other evidence to support that claim. We decline to fault the Agency for failing to permit unsupervised visits at that home in the absence of evidence that it was suitable for N.P. and Z.P.

Finally, we are not persuaded by father's assertion that the Agency " 'unreasonably foreclosed' " family reunification by failing to liberalize the visits with N.P. and Z.P. and deprived him of the opportunity to demonstrate his ability to safely care for the children. Instead, the court's concern over father's ability to care for the children centered on his failure to ameliorate the reason the children were removed in the first place, in particular, delaying bringing H.P. to the hospital and being under the influence of marijuana when he did so. Yet, over the following two years, father tested positive for marijuana on every single test he took, refused to cease using THC, and declined to engage in an IOP as recommended. Thus, the record

does not support his claim that the lack of unsupervised visits with N.P. and Z.P. foreclosed family reunification.  (See *Serena M.*, *supra*, 52 Cal.App.5th at p. 673 [though visitation is a key part of reunification, court must focus on best interest of children and elimination of conditions leading to finding of harm].)

In sum, there is substantial evidence in the record supporting the court's finding at the March 10, 2026 hearing that reasonable services were provided to father.  Accordingly, we shall deny father's petition.

### DISPOSITION

The petition for an extraordinary writ is denied on the merits. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452(h)(1).)  The request for a temporary stay is denied as moot.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_PETROU, J._

WE CONCUR:

_TUCHER, P. J._

_RODRÍGUEZ, J._

A175860 / _J.P. v. Superior Court_